O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT A. YOUNG,<br><br>      **Plaintiff,**<br><br>    v.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>      **Defendant.**<br>_____ | CASE NO. SACV 08-0541 AG (MLGx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Plaintiff Scott A. Young ("Plaintiff" or "Young") was working at Disneyland on December 24, 2005, when he slipped and fell, injuring his left leg and knee. In July 2006, Plaintiff's left leg was amputated above the knee. In May 2008, Plaintiff filed this action against Defendant The Prudential Insurance Company of America ("Defendant" or "Prudential"), seeking about $45,000 in accidental dismemberment benefits under the Disney Worldwide Services, Inc. Employee Welfare Benefits Plan (the "Disney Plan" or the "Plan"), which Prudential administers and insures. A court trial was held on May 20, 2009.

**FINDINGS OF FACT**

After reviewing the administrative record presented by Prudential, the Court makes the following findings of fact, including any findings of fact found in the Conclusions of Law.

**1.     JURISDICTION**

Because this case is a civil action for benefits under an insurance plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), a federal statute, this Court has jurisdiction under 28 U.S.C. § 1331.

**2.     PRIOR HISTORY OF LEFT LEG INJURIES**

In 1989, Plaintiff shattered his left leg in a motorcycle accident, and spent about a year recovering. (AR 90.) In 1993, Young had a second motorcycle accident, shattering his knee in 23 places. (AR 90.) Plaintiff underwent five surgeries to treat that injury, including a total knee replacement. (AR 90.) Plaintiff suffered a work injury in 2004, and that injury caused him to miss six weeks of work. (AR 90.) Before the 2005 accident, Plaintiff's left leg showed numerous incisions and wounds, as well as "significant atrophy." (AR 92.) Plaintiff suffered from severe osteoarthritis.

**3.     INJURY AND TREATMENT**

Plaintiff was working for Disney on December 24, 2005, when he slipped and fell, injuring his left leg and knee.

Plaintiff saw Dr. Michael J. Gillman on January 5, 2006. Gillman noted Plaintiff's "very complicated and significant" past history. (AR 90.) Gillman attributed 50% of Plaintiff's "current symptoms" to the December 24, 2005 injury and 50% to his "underlying condition in his left knee and leg, predating his current injury." (AR 93.) On January 18, 2006, Plaintiff returned to Dr. Gillman, reporting severe and ongoing pain. (AR 95.) Gillman advised that an above-the-knee amputation might be the best treatment for his pain, explaining that Plaintiff was "at extremely high risk for having a knee reconstructive surgery." (AR 95.) Gillman suggested that Plaintiff get a second opinion. (AR 95.)

On February 23, 2006, Plaintiff consulted Dr. Ralph J. Venuto for a second opinion on total knee replacement versus amputation. (AR 99-104.) Venuto agreed that 50% of Plaintiff's knee condition was pre-existing and 50% was due to the December 24, 2005 injury. (AR 103.) Venuto recommended that Young consult Dr. Stephen A. Mikulak, an expert in knee replacements. (AR 103.)

On March 27, 2006, Plaintiff consulted Dr. Mikulak. (AR 105-110.) Mikulak noted that Plaintiff had "significant predisposing factors due to his preexisting left knee fracture and nerve injury, which complicates his situation." (AR 109.) Mikulak agreed with Gillman and Venuto that 50% of Plaintiff's condition was due to pre-existing conditions and 50% was due to the December 24, 2005 injury. (AR 109.) But Mikulak noted that Plaintiff's pre-existing conditions may have been more than 50% responsible for Plaintiff's current condition, based on X-rays taken just before the December 24, 2005 injury. (AR 109.) Those X-rays suggested that Young may have suffered from a "previous patella alta" and "deep hardware failure," but Mikulak noted that one or both of those issues was probably related to the December 24, 2005 injury. (AR 109.)

Mikulak advised Plaintiff that "hardware removal and knee reconstruction may be fraught with significant complications given his lack of an adequate extensor mechanism and that he has a very poor skin envelop[e] which may predispose him to very high risk for infection." (AR 110.) Mikulak told Plaintiff that amputation was possibly his only option, and recommended that Plaintiff consult Dr. Alexander H. Tischler. (AR 110.)

On May 1, 2006, Dr. Tischler examined Plaintiff. (AR 111-112.) Tischler noted that an amputation was appropriate, but that the decision was Plaintiff's. (AR 111.) In a July 19, 2006 progress report, Tischler stated: "We would love to do a thorough-knee, but he has flaps on the medial side, and I am just worried that they will not heal. Therefore, an appropriate above-knee amputation will be done." (AR 113.)

On July 21, 2006, Plaintiff underwent an above-the-knee amputation on his left leg.

**4.     CLAIM FOR BENEFITS**

**4.1     Policy terms**

Under the Plan, Accidental Dismemberment Benefits are payable when:

    (1)     You sustain an accidental bodily injury while a Covered Person.
    (2)     The Loss results directly from that Injury and from no other cause.
    (3)     You suffer the loss within 90 days after the accident.

(AR 77-78.)  Losses are not covered if they result from, among other things, "Sickness, whether the Loss results directly or indirectly from the Sickness." (AR 78.)

**4.2     Original claim**

On July 18, 2006, Plaintiff signed a Prudential Group Accidental Injury Claim Form, requesting dismemberment benefits under the Plan.  (AR 68-70.)  On September 1, 2006, Plaintiff's wife called Prudential regarding her husband's claim.  (AR 159.)  Prudential advised her that the claim would be denied because Plaintiff's amputation occurred more than 90 days from the date of his accident. (AR 159.)   Prudential also advised Plaintiff's wife that she could appeal the decision.  (AR 159.)

On September 5, 2006, Plaintiff's wife spoke to Prudential again, informing them that dismemberment was required within days of Plaintiff's accident, but Disney requested they get other medical opinions, which "delayed the inevitable."  (AR 160.)  Prudential told Plaintiff's wife that the claim would be referred to their legal department, but advised her that there was no guarantee the denial would be overturned.  (AR 160.)

On September 7, 2006, Plaintiff's wife wrote a letter to Prudential, enclosing Plaintiff's medical records from the period between the December 24, 2005 accident and the July 2006 amputation.  (AR 88.)

On September 13, 2006, Prudential denied Plaintiff's claim for accidental dismemberment benefits.  (AR 77-80.)  Because the accident occurred more than 90 days before the amputation, Prudential explained, the amputation did not qualify as an "accidental dismemberment" under the policy.  (AR 78.)  Prudential advised Plaintiff that he could appeal the decision and submit more information, and, after completing a first level appeal, file a lawsuit under ERISA.  (AR 78-79.)

**4.3    Appeal**

On November 13, 2006, Plaintiff appealed Prudential's denial of his claim.  (AR 84.)  Plaintiff argued that his accident occurred during the holidays, and he was unable to get a medical appointment until January 4, 2006.  (AR 84.)  Plaintiff also argued that when he saw Dr. Gillman on January 18, 2006, Gillman determined that an above-the-knee amputation was Plaintiff's best treatment option, but wanted a second opinion.  (AR 84.)  Plaintiff asserted that it was well-documented on January 18, 2006, that an amputation "was to occur."  (AR 84.)  Plaintiff also noted that neither Disney Benefits Center nor Prudential had informed him about or offered him a copy of the Plan documents.  (AR 84.)

On November 21, 2006, Prudential sent Plaintiff a letter stating that it needed more time to process an appeal.  (AR 118.)  Prudential anticipated that a determination would be made by December 21, 2006.  (AR 118.)

An internal Prudential memo dated November 21, 2006, notes that Plaintiff's claim was originally denied "for amputation within 90 days" and that "Evidence supports work man compensation exam delayed amputation."  (AR 116.)  Prudential sought a medical opinion "that without the previous medical history that amputation would have still occurred from this accident alone."  (AR 116.)  On December 18, 2006, Dr. Joyce Bachman determined that the

answer to that question was "no." (AR 153-154.) "With reasonable medical certainty," she stated, "the AKA amputation was not due solely to the accidental fall that occurred in 12/05." (AR 154.)

A December 21, 2006 internal memo states that an Appeals Team was created to discuss Plaintiff's claim and that it unanimously agreed to uphold the denial. (AR 152.) The committee's notes state that the Plan's "90 day limit would have been waived since work comp delayed the surgery if it was truely [*sic*] accidental. Leaving that out since medical exclusion and injury and no other cause." (AR 152.) The committee also noted that Plaintiff had "pre-existing medical conditions that contributed to the amputation of his leg." (AR 152.)

Prudential denied Plaintiff's appeal on December 21, 2006. (AR 121-124.) Prudential explained that to receive benefits, Plaintiff had to meet all policy requirements, including the requirement that loss result "directly from the injury and no other cause." (AR 121.) Because Plaintiff's amputation "occurred due to osteoarthritis and because of several accidents," Prudential explained, it did not meet the Plan's definition of an accidental dismemberment. (AR 123.) Prudential advised Plaintiff that he was entitled to receive, free of charge, copies of all records relevant to his claim, and that Plaintiff could submit a second appeal or file a lawsuit under ERISA. (AR 123.)

**CONCLUSIONS OF LAW**

The Court makes the following conclusions of law, including any conclusions of law found in the Findings of Fact.

A *de novo* standard of review applies to this case. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 1996). It is the plaintiff's burden to prove that he is entitled to benefits. *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003).

Plaintiff argues that Prudential applied the wrong test in denying his appeal. Plaintiff asserts that the "predominant cause" test set forth in *Henry v. Home Insurance Co.*, 907 F. Supp.

1392, 1398 (C.D. Cal. 1995) should apply. Under that test:

> if a plaintiff can show that the accident directly caused the resulting injury, then recovery is appropriate, even where a genetic predisposition, susceptibility or pre-existing condition may have contributed to the extent of the harm.

*Id.* Prudential failed to apply that test, Plaintiff argues, when it asked Dr. Bachman whether "without the previous medical history that amputation would have still occurred from this accident alone." Had Prudential applied the right test, Plaintiff argues, it would have found that Plaintiff's December 24, 2005 injury was certainly a "direct cause" of the amputation. Indeed, Plaintiff points out that in correspondence, Prudential acknowledged that the amputation occurred "as a result of" the December 24, 2005 injury.

Prudential responds that the "substantial factor" test applies here because, under Ninth Circuit law, the predominant cause test applies only when plan language limiting benefits is buried or inconspicuous. *McClure v. Life Ins. Co. of North America*, 84 F.3d 1129, 1136 (9th Cir. 1996) ("if the exclusionary language here in question is conspicuous it would bar recovery if a preexisting condition substantially contributed to the disability," and this could result in a denial "even though the claimed injury was the predominant or proximate cause of the disability"). The *McClure* case specifically distinguished the *Henry* case on which Plaintiff relies, stating that "*Henry* emphasized that the language limiting coverage to loss caused directly and independently by an accident was 'inconspicuously included within the [ERISA plan's] definition of 'injury.'"" *McClure*, 84 F.3d at 1135 (quoting *Henry*, 907 F. Supp. at 1396). The predominant cause test is designed to protect "objectively reasonable expectations of coverage." *Henry*, 907 F. Supp. at 1396 (quoting *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 555 (9th Cir. 1995)).

Here, Plaintiff does not appear to argue that the exclusionary language in the Plan itself was either buried or inconspicuous, and Plaintiff has provided no evidence to that effect.

Instead, at the court trial, Plaintiff argued that the language should be considered buried or inconspicuous simply because Prudential failed to provide Plaintiff with a copy of the Plan documents. But ERISA only requires a plan administrator to furnish summary plan documents to participants and beneficiaries, and it is undisputed that Disney Worldwide Services, Inc. is the designated administrator of the Disney Plan. *See* 29 U.S.C. §§ 1021(a), 1024(b)(1). Prudential had no obligation to provide Plaintiff with a copy of Plan documents. Further, Plaintiff does not argue that he relied on information in the summary plan documents to his detriment. Without such reliance, the Court cannot find it appropriate to invoke the "reasonable expectations" doctrine. *See Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1150 (7th Cir. 1998) ("Moreover, Hightshue has not shown that she relied on either the Plan or Summary Plan Documents, and without reliance, her reasonable expectations are not legally cognizable."); *Mauser v. Raytheon Company Pension Plan for Salaried Employees*, 239 F.3d 51, 55 (1st Cir. 2001) ("It is not enough to a show a 'mere expectation' that certain benefits will materialize; action must have been taken in reliance on reasonable expectations formed after reading the Plan Summary.").

The Court sympathizes with Plaintiff's plight. But "the reasonable expectation concept must be limited by something more than the fervent hope usually engendered by loss." *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 387 n. 8 (quoting *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 395 (Ariz. 1984)). In denying Plaintiff coverage, Prudential applied the correct test and reached the correct result.

**DISPOSITION**

Prudential's denial of Plaintiff's accidental dismemberment benefits is AFFIRMED. Prudential may submit a brief, concise proposed judgment to the Court within 14 days of this Order.

IT IS SO ORDERED.

DATED: September 8, 2009

_____
Andrew J. Guilford
United States District Judge